**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 160589-U

Order filed January 27, 2020
Modified upon denial of rehearing March 31, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0589 Circuit No. 15-CF-280 |
| | ) | |
| DURELL TAYLOR, | ) ) | Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Justice Holdridge concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1    *Held*:  Trial court did not err when it denied defendant's motion for a directed verdict. The State did not commit prosecutorial misconduct during closing arguments. Defense counsel was not ineffective.

¶ 2    Defendant Durell Taylor was found guilty on a number of charges relating to an armed robbery and police chase. The jury convicted him on all charges and the trial court sentenced him to terms of imprisonment on each count. He appealed. We affirm.

¶ 3                                    FACTS

¶ 4          Defendant Durell Taylor was charged with two counts of armed robbery (720 ILCS 5/18-2(a)(1), (2) (West 2014)) and one count each of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)), criminal trespass to a residence (720 ILCS 5/19-4(a)(2) (West 2014)), aggravated fleeing or attempting to elude a police officer (625 ILCS 5/11-204.1(a)(4) (West 2014)), and child endangerment (720 ILCS 5/12C-5(a)(1) (West 2014)). The charges arose from incidents where Nicholas Woods, a codefendant, took a cell phone and money from one person and a cell phone from another individual. Woods also forced the second victim to the ground at gunpoint. According to the victims, Taylor was driving a car down the alley where they lived, following Woods, who was on foot. After the robberies, Woods jumped into the car and it fled the scene. The police located the vehicle and a chase ensued, ending when the car was hit going through an intersection. Taylor, the driver, and Woods, the passenger, both jumped out of the car and fled. A shotgun was found sticking out the passenger side front window. Taylor's seven-month-old stepson was discovered in the back seat of the car.

¶ 5          The State proceeded on an accountability theory against Taylor, alleging he planned the robberies with Woods, who was the actual perpetrator. Woods pleaded guilty to the armed robberies and Taylor proceeded to a jury trial. Before the trial started, Taylor moved *in limine* seeking to bar the State from impeaching him with his prior armed robbery conviction. The trial court denied the motion, finding the fact of Taylor's prior conviction was admissible for impeachment. The trial ensued. During opening statements, defense counsel twice attempted to argue that Woods maintained he committed the robberies without Taylor's involvement. The trial court sustained the State's objections to the argument, finding the statements to be inadmissible hearsay.

2

¶ 6        Victim Victoria Turngren testified that she was sitting on her back porch when she saw a man walking down the alley with a silver car following behind him. She did not pay attention to the man and did not get a close look at him but estimated he was shorter than her height and had an Afro hairstyle. She walked to the alley and saw the car parked by her neighbor's garage. Woods was standing on the driver's side of the car. She estimated him to be a couple inches taller than her six foot height. When he noticed her, he hid his face with a bandana and approached her yelling, "What? What? You thought you—you think you saw something? What?" Woods grabbed for her cell phone but she would not it let go. He slammed her to the ground, where they scuffled until Turngren surrendered her cell phone. As Woods walked back to the car, Turngren stood up and began yelling for help. Woods turned around, reapproached her, pointed a gun, and told her to lay on the ground. She followed his orders and Woods got into the silver car, which drove out of the alley. Turngren returned to her house, called the police and provided the license plate number of the silver car.

¶ 7        Turngren could not recall if she saw the second man and could not see when the car left whether there was more than one person in the vehicle. It was probable that she initially told a police officer that "both" got in the car and she would trust her first statement. Officers drove her to the police station for a showup. She stayed in the squad car and officers separately brought out two men for her to identify. She could not identify the first man with 100% certainty, although he could have been the man she saw walking down the alley. She identified the second man brought out, Woods, as the man who assaulted her. At the time of the assault, he wore a black hooded sweatshirt with the hood up. After the showup, she went to the emergency room so her injuries could be treated. Her injuries included a broken toe, injured ankle, scraped knees and elbows, and gashes on her finger and toe.

¶ 8    Victim Richard Simms testified that he and his wife, Janice Simms, were returning home and saw a man walking down the alley behind their house. The man was wearing a black sweatshirt with the hood pulled up. Richard also saw a silver car parked across the alley by their neighbor's garage. He could not recall if anyone was in the car. Richard pulled into his garage and was helping Janice out of the car when a man said, "Give me your money." He was pointing a gun at Janice. Richard told the man to leave Janice alone and the man turned the gun on him. Richard pulled bills out of his pocket and laid them on the hood of the car. He estimated he had $5 to $10 in singles. Woods asked for Richard's cell phone. He took the money and cell phone and left. Richard closed the garage door and called 911. Richard then heard a woman yelling for help.

¶ 9    Victim Janice Simms testified similarly to her husband. In her recollection, no one was in the silver car when it was parked. The man who robbed them was wearing sports shorts and a black sweatshirt. After he left the garage, her neighbor yelled and she heard a car door slam and a car drive away. Both Richard and Janice identified Woods as the man walking in the alley and as the man who robbed them. They did not identify Taylor and could not identify him in court.

¶ 10    Zachary Jordan testified that the day of the offenses, he checked on his barking dog and saw a man on top of his dog. The man was wearing a white tee-shirt and jeans. He charged Jordan and pushed his way through the back door of Jordan's house and into the kitchen, where the men wrestled. The man said he had been attacked, was in trouble and needed help. Jordan saw a police officer outside and went to talk to him. The man fled and was caught by the police. Jordan identified Taylor in court as the man in the encounter.

¶ 11    Michael Surprenant, a Kankakee police officer, testified that he conducted a show-up for Turngren, who was not able to identify Taylor. She thought he could have been one of the perpetrators.

¶ 12        Kevin Orms, a Bradley patrol officer, testified he heard the dispatch about the armed robberies and began to follow a silver car matching the license description provided by Turngren. The car drove away when he turned on his emergency lights. The car went through two stop signs and was hit going through an intersection. Taylor and Woods ran away, although both were soon discovered and arrested. Taylor's seven-month-old stepson was discovered in the back seat and was taken to the hospital. A single barrel shotgun was found sticking out of the passenger side front window. The two cell phones stolen in the robberies were discovered along the route on the south side of the street, indicating they were tossed from the passenger seat. They were not tested for fingerprints.

¶ 13        Solo-Veno Pena, a Bradley police officer, testified that he saw a shotgun sticking out of the passenger side front window when he responded to the crash. He also saw a child in a car seat that was tipped over in the back seat. The child's feet were dangling over the floor and the seatbelt was across his neck. The child was not crying or moving but was drooling.

¶ 14        Greg Glidwell, a Bradley firefighter and paramedic testified that the child was hanging in the car seat by its neck and frothing at the mouth, which indicated possible strangulation. Once the child was released from the car seat, he was dazed.

¶ 15        Steven Hunter, a Kankakee detective, testified that he joined in the chase of the silver car. One suspect was wearing a white shirt. He identified Taylor in court. He searched Taylor prior to interviewing him and discovered one $10 bill, one $5 bill and nine $1 bills on him. Hunter's interview with Taylor was recorded and the video recording played for the jury. The interview depicted Taylor explaining the silver car belonged to his girlfriend. The baby in the back seat was her child. Taylor and his girlfriend dropped her daughter off at day care earlier in the day and then Taylor dropped his girlfriend at work. He took her son to see her at lunchtime and bought her lunch

at Subway inside her workplace. He went home after lunch but could not remember any details about what he did as he and his girlfriend were fighting and he was "zoned out." Taylor ran from the police because he was on parole and driving without a license. He denied the gun belonged to him. He did not know how or when the gun was placed in the car. He denied robbing anyone.

¶ 16 The State entered a certified copy of Taylor's conviction that established he was convicted of armed robbery in March 2012 and rested its case. The defense moved for a directed verdict on all counts, which the trial court denied.

¶ 17 The defense presented its case. Woods testified. He was admonished regarding his fifth amendment right to remain silent and Woods testified he was waiving the right. He had known Taylor for a short time when he spent the night at the apartment where Taylor lived with his girlfriend and her children. He had stolen a shotgun two weeks earlier as he needed it for protection. He stored the gun in various places, usually hiding it at night. On the morning of the robberies, he asked Taylor to take him to pick up some clothes he had stashed at a vacant house. Taylor gave Woods the car keys and Woods went on his own. He placed the gun in the car when he picked up his clothes. He and Taylor went to Walmart at some time during the day. The son of Taylor's girlfriend was also with them. Taylor had lunch with his girlfriend, after which she and Taylor argued on the phone. He told Taylor to stop in the alley so he could use the outdoor facilities. His actual intent was to hide the gun in the alley so he could return for it later. Woods's brother lived about a block from the alley and Woods planned to spend the night with him. When he was trying to hide the gun, a car with two people in it drove by. He believed they saw him trying to hide the gun so he robbed them. He also robbed Turngren.

¶ 18 According to Woods, Taylor was not involved in the armed robberies. Taylor did not see Woods take the gun out of the car because Taylor was on the phone and not paying attention. He

6

and Taylor did not converse about the shotgun or about robbing anyone. After assaulting Turngren, Woods returned to the car and forced Taylor to drive to the north side. He pointed his gun at Taylor and warned him not to speed out of the alley. He admitted he lied to the police and gave different statements. He said he was untruthful in both interviews. Defense counsel attempted to ask Woods regarding whether he spoke to the police about Taylor's lack of involvement but the State objected and the court sustained the objection. Defense counsel also attempted to present a letter Woods wrote denying Taylor's involvement and the court again sustained the State's hearsay objection. On cross-examination, Woods acknowledged that he initially told the police that he gave Taylor money and also admitted he lied when he told the police he paid someone to drive him to Bradley.

¶ 19    Taylor testified he lived with his girlfriend and her children at the time he was arrested. His girlfriend worked at the Walmart pharmacy. Woods had spent the night with them because Taylor was helping him obtain a job through the temporary employment service where Taylor worked. His girlfriend let Taylor have the car after he dropped her at work. When he returned home, Woods wanted Taylor to drive him somewhere so Woods could pick up his clothes. He gave Woods the car and stayed home with his stepson, who needed a breathing treatment. He and Woods took the child to his girlfriend's workplace at lunchtime. He bought her a sandwich at the Subway inside Walmart and put the change in his pocket. He also stopped for gas, where he put the change from a $20 bill into his pocket, as well as change from buying cigarettes.

¶ 20    After they left Walmart, Woods asked Taylor to pull into an alley. Taylor was not paying attention to Woods because he and his girlfriend were arguing on the phone. Woods told him he had to go to the bathroom.A few minutes after Woods exited the car, Taylor saw the passenger door open and noticed a gun. He told Woods his son was in the car and Woods could not have the gun. Woods was "bugged out and panicky." Woods entered the car and told Taylor to drive. He

7

threatened Taylor and directed the escape route. Taylor did not know Woods had committed any crime but thought Woods might be mad because they missed his appointment at the temporary employment agency. Taylor did not stop for the police because he was afraid of Woods. He admitted he told the police he did not stop because he lacked a driver's license.

¶ 21     After the crash, he tried to get his son but he noticed the police with guns and he did not want to be shot or have his son hit by a ricocheting bullet. He told the police he did not know there was a gun in the car or how it was placed in the car. He also admitted he told the police he only knew Woods by the nickname, "G," although he knew Woods's real name. He denied bursting into Jordan's house, saying Jordan let him enter. Taylor insisted that part of the interview with police where different facts were revealed was not recorded or not presented at the trial. He denied participating in any armed robbery and denied knowing that Woods was going to rob anyone.

¶ 22     The defense rested and a jury conference took place. The State presented a jury instruction indicating Taylor had been previously convicted of armed robbery. Taylor objected, arguing the State only needed to prove Taylor had a prior conviction for a forcible felony. The trial court determined it would give the State's instruction as presented. The State also presented Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03), in which the State had included the following language from the committee notes: "intent to promote or facilitate the commission of an offense may be shown by evidence that the defendant shared a criminal intent of the principal or evidence that there was a common criminal design." The trial court ordered the State to remove the committee language from the instruction.

¶ 23     The defense renewed its motion for a directed verdict after the State's rebuttal case. The trial court denied the motion, closing arguments took place and the case was presented to the jury. Following deliberations, the jury found Taylor guilty on all counts. He moved for a new trial,

8

which the trial court heard and denied. The trial court sentenced Taylor to 35 years' imprisonment on each count of armed robbery, which included the mandated 15-year firearm enhancement, 7 years' imprisonment for unlawful possession of a weapon by a felon, 4 years' imprisonment for criminal trespass, 3 years' imprisonment for aggravated fleeing and eluding, and 364 days' imprisonment for child endangerment. Taylor moved to reconsider his sentence, which the trial court denied. He appealed.

¶ 24                                                      ANALYSIS

¶ 25        There are three issues on appeal: whether the trial court erred when it denied Taylor's motion for a directed verdict; whether the State committed prosecutorial misconduct during closing argument; and whether defense counsel was ineffective.

¶ 26        We first address whether the court should have granted Taylor's motion for a directed verdict at the close of the State's case-in-chief. Taylor argues that the trial court erred when it denied his motion for a directed verdict on the armed robbery and unlawful possession of a weapon by a felon charges. Taylor argues that the State did not establish that he intentionally aided Woods prior to or during the robberies and failed to establish that Taylor possessed the shotgun used in the robberies.

¶ 27        A defendant may move the court to enter a not guilty finding or direct the jury to find him not guilty when the State's evidence is insufficient to sustain every element of the offense beyond a reasonable doubt. 725 ILCS 5/115-4(k) (West 2014). In considering a motion for a directed verdict, the trial court considers the evidence in a light most favorable to the State and determines whether a reasonable person could conclude the defendant was guilty beyond a reasonable doubt. *People v. Withers*, 87 Ill. 2d 224, 230 (1981). We review *de novo* a trial court's determination on a motion for a directed verdict. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 26.

9

¶ 28    A defendant is accountable for another's criminal conduct when before or after an offense is committed "and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). To sustain a conviction under an accountability theory, the State must prove beyond a reasonable doubt that the defendant shared the principal's criminal intent or common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). The shared-intent theory requires the State to demonstrate the defendant had actual knowledge of the other's criminal intent. *People v. Fernandez*, 2014 IL 115527, ¶ 21. A defendant's shared intent may be inferred from the circumstances of the offense and the defendant's character or acts. *People v. Stanciel*, 153 Ill. 2d 218, 234 (1992). A common-design theory provides that when two or more people agree on a criminal plan, acts committed by one party that further the plan are considered the acts of all the parties and they are all equally responsible for the acts. *In re W.C.*, 167 Ill. 2d 307, 337-38 (1995).

¶ 29    A person's presence at the commission of the offense is insufficient to establish accountability. *Stanciel*, 153 Ill. 2d at 237. However, the State is not required to prove active participation or words of agreement to sustain a conviction on an accountability theory. *People v. Turner*, 375 Ill. App. 3d 1101, 1104 (2007). Factors to be considered when deciding accountability include the defendant's presence at the scene without disapproving the criminal offenses, flight from the scene, failure to report the crime, sharing the proceeds from the criminal act, and destroying or disposing of evidence. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995).

¶ 30    Taylor does not dispute that he drove Woods and that he was present at the scene. Rather, he contends that he was unaware of Woods's intent or commission of the offenses until after they had occurred. The evidence suggests otherwise. Victims Richard and Janice Simms testified that they drove past a man walking in their alley and noticed a car parked across the alley in front of

10

their neighbor's garage. Richard did not recall seeing anyone in the parked car and Janice testified no one was in the car. Victim Victoria Turngren testified she first noticed a man walking in front of a car as it moved down the alley behind her house. She described the man who was walking as shorter than her height and the man who assaulted her as taller than her. This testimony suggests that Taylor was more than an innocent driver, that he too, was surveying the alley for criminal purposes. At the least, Turngren's testimony allows the inference that Taylor did not unwittingly turn into the alley merely so Woods could relieve himself. Both Richard and Janice testified that they were robbed at gunpoint, necessitating Woods to have removed the gun from the back seat when he exited the car to walk down the alley or after the car was parked when Taylor was allegedly sitting in the front seat.

¶ 31      Turngren also stated the man who robbed and assaulted her was standing on the driver's side of the silver car when he put on a bandana and attacked her. It would be reasonable to infer that Taylor, seated in the driver's seat as he claimed he was, would have necessarily seen Woods cover his face and attack Turngren. At the least, he would have heard Turngren's screams for help. After Woods assaulted Turngren, he jumped into the car carrying the shotgun. Turngren told the police that "they both got into the car" and she believed her initial statement to be more trustworthy than her later recollection. These facts raise a reasonable inference that Taylor was not merely the driver who waited unknowingly in the car but planned and was present and aware of the crimes as they were being committed.

¶ 32      Taylor took no action to disapprove Woods's criminal acts. At the time the Simmses were robbed, he was either sitting in the car across the alley or out of the car and somewhere on foot in the alley. Based on the Simmses' perspective, Taylor would have been in a position to see Woods enter their garage. As mentioned above, Woods retrieved the gun from the back seat prior to his

confrontation with the Simmses as he used it when he robbed Richard. According to Woods's version of events, he had to rob the Simmses because they saw him carrying the gun when they drove by him as he walked in the alley. Woods also asserted he secreted the gun in the back seat in such a manner that Taylor was unable to see it. It follows that Woods retrieving the gun from its secured position would entail more than simply reaching into the back seat and grabbing the gun. Even if distracted on his cell phone, it would be unlikely Taylor would be unaware of Woods's actions. For Woods to be carrying the gun down the alley, Taylor would have had to stop the car to let Woods out and allow him to grab the gun. As Taylor followed Woods down the alley, it is improbable that he was unable to observe the gun, particularly in light of Woods's testimony that he was forced to act because he thought Richard and Janice saw him with the gun. The reasonable inference from this evidence is that Taylor and Woods agreed on a plan or formed a shared intent to rob who they could find in the alley prior to Woods getting out of the car with his gun to walk down the alley with Taylor trailing him.

¶ 33     As further evidence of a common plan or shared intent, Taylor did not try to stop Woods from confronting the Simmses or Turngren with the gun or check on them after the robberies. He did not order Woods out of the car with the gun or refuse to drive out of the alley. He did not exit the car and take his stepson with him. He did not call 911. Instead, he aided Woods in fleeing from the scene. Taylor claims he was forced at gunpoint by Woods to drive. As the trier of fact, the jury was tasked with assessing Taylor's credibility and found his version that he drove under threat to be incredible. There is no evidence to dispute its conclusion.

¶ 34     Other evidence from which a reasonable person would infer Taylor's guilt includes his flight from the car after he crashed it. It is unlikely that Woods would have forced him to flee, as Woods himself was in flight. We consider it significant that Taylor left his injured child in the

12

back seat of the car when he fled. In our view, a reasonable person would find Taylor's conduct concerning his stepson to be evidence from which guilt could be inferred. Taylor said he attempted to open the back door of the car to retrieve his child but it would not open. The dashcam video shows Taylor stop at the back door before fleeing. Even if he had not been able to open the door as he claimed, what Taylor would have seen through the car window was his son in a tipped car seat "suspended with his feet dangling over the floor" and the seatbelt running across his neck. Medical personal observed the infant was frothing at the mouth, which indicated strangulation. A reasonable person would consider that Taylor's concern for the legal consequences of the criminal acts outweighed his concern for his child and would infer guilt. Other evidence of guilt includes the small bills the police found on Taylor when he was arrested, including nine $1 bills, which corresponded to the amount and type of currency Simms said was taken from him. A reasonable person would infer that Taylor shared in the proceeds from the robberies committed by Woods. This inference is supported by the facts that no bills were found on Woods or in the vehicle. We find the State's evidence was sufficient for the jury to find Taylor guilty of armed robbery and supported the trial court's denial of his motion for a directed verdict.

¶ 35        We further find the State also presented sufficient evidence to prove possession of the shotgun. To prove constructive possession, the State was required to establish that Taylor knew the gun was present in the car and exercised immediate and exclusive control over the area where the gun was found. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17 (citing *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003)). The following factors are used to determine whether a defendant had knowledge that a weapon was in a car: the visibility of the gun from the defendant's position in the car, the amount of time the defendant had to observe the weapon, gestures or movements suggesting an attempt to conceal or retrieve the weapon, and the weapon's size. *People v.*

13

*Hampton*, 358 Ill. App. 3d 1029, 1033 (2005) (citing *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002)).

¶ 36    A reasonable person would infer from the facts that Taylor was aware of the shotgun. The gun was on the floor of the back seat, where Taylor placed his stepson. In order to place his child in the car seat, Taylor would be required to reach into the vehicle in such a manner that the floor would have been visible, even if the seats were reclined back. Per Woods, the gun was in the car for the entirety of the trip to Walmart and then in the alley. Taylor said he kept his seat tilted far back so he could check on his stepson, which would give him visual access to the gun during the trip. Thus, regardless of Woods's claim that he placed the gun in the vehicle without Taylor's knowledge, it would be impossible for someone not to see a long gun in a compact car, particularly when it was placed on the back seat floor, which Taylor accessed to seat his stepson.

¶ 37    As discussed above, in order for Woods to have the gun while he walked down the alley, he would have had to pull it out of the back seat, which action would be unlikely to occur without Taylor's awareness of the gun. Taylor admitted he was aware of the gun once the crimes were committed. It was found visible in the front passenger seat after the accident. At that point, Taylor did not exit the vehicle after crashing it, surrender and turn the gun over to the police. Although the car belonged to Taylor's girlfriend, it is undisputed that he was in possession and control of it. Supposedly, the gun was placed in the vehicle earlier in the day and prior to Taylor and Woods's travelling in the car together throughout the day. Even after seeing the gun, Taylor did not separate himself from it or insist it be removed from the vehicle he controlled. Woods testified that they were fleeing back to Taylor's residence after the robberies, where the gun was likely to remain in the car or be brought into Taylor's residence. Taylor's participation in fleeing from the scene suggests his attempt to distance himself from the gun. From this conduct it can be inferred that

14

Taylor had knowledge and control over the gun. Thus, we agree with the trial court that the State proved beyond a reasonable doubt that Taylor constructively possessed the shotgun. It did not err when it denied Taylor's motion for a directed verdict on this count.

¶ 38        The next issue for our review is whether the State committed prosecutorial misconduct during closing arguments. Taylor complains that the State's comments were improper and denied him a fair trial. He points to the State's comments that Woods was not a credible witness and to alleged misstatements of law and fact. Because Taylor did not preserve this issue for appeal, our review is only appropriate under the plain error doctrine. *People v. Enoch*, 122 Ill. 2d 176, 187 (1988). For the doctrine to apply, there must first be plain or obvious error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). If there was plain error, review is proper where (1) the evidence was closely balanced or (2) the error was so serious it threatened the integrity of the justice system, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 39        The State owes a criminal defendant a duty of fairness throughout the trial. *People v. Rowjee*, 308 Ill. App. 3d 179, 185 (1999). A prosecutor may comment on the facts in evidence and make reasonable references from those facts but he cannot misstate the facts or the law. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29. A prosecutor breaches that duty when his comments in closing argument include inferences based on deliberate misrepresentations of fact. *People v. Amaya*, 255 Ill. App. 3d 967, 974 (1994). The improper comments must be a material factor in the conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991) (citing *People v. Lyles*, 106 Ill. 2d 373, 391 (1985)). The question is whether the jury could have reached a contrary verdict had the improper comments not been made. *Id.* (citing *People v. Witted*, 79 Ill. App. 3d 156, 168 (1979)).

¶ 40        We first look at the State's argument to the jury that Woods had nothing to lose by taking sole responsibility for the criminal conduct because he had already pleaded guilty to it. Taylor says

the State, however, knew that Woods admitted his lone role prior to trial and the State's comments mislead the jury to improperly infer that Woods was not credible as to his claims at trial that Taylor was not involved in the crimes. Taylor uses the court's admonishment to Woods regarding his fifth amendment rights prior to his testimony as indication the State believed Woods did have something to lose. We consider that the prosecutor's comments were made as part of an explanation of the jury's role as fact finder. He commented that the jury was to assess witness credibility and continued with a discussion regarding Woods's credibility. It was not improper argument. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993) (State may comment on the defendant's credibility and the believability of the defense's theory of the case if based on the evidence or reasonable inferences from it).

¶ 41 Taylor challenges the following comments by the State in closing argument as misstatements of law. Taylor argues the State's analogy mislead the jury because the driver must knowingly be driving the getaway car. In discussing accountability, the State compared Taylor's role in the crimes to that of the driver of the "getaway" car in a bank robbery. The prosecutor said that there would be no crime without the escape, which Taylor claims was a misstatement of law because robbery is completed after the property has been taken and flight is not an element of the offense. *People v. Dennis*, 181 Ill. 2d 87, 103 (1998) (offense of armed robbery complete when victim parts with property against his will because of force or threat of force from defendant). The prosecutor stated that "[w]ithout the defendant there is no crime[,]" because Taylor provided the means of transportation. According to Taylor, this comment misstated the law by suggesting Taylor was guilty by association. The prosecutor's comments were made in the context of an explanation regarding accountability, that is, if Taylor had not driven the car to and from the robbery, he would not be accountable for Woods's crimes. The State did not have to prove Taylor

16

knew Woods was going to commit the robberies when he drove Woods to the alley and could establish his knowledge by his actions before, during or after the crime.

¶ 42    The State commented that Taylor was not believable when he said he had no knowledge of the gun because the weapon was a shotgun and the car Taylor was driving was a compact car. According to Taylor, the State improperly conflated the two elements of possession: knowledge and control and misstated the law by arguing that actual possession was established as Taylor drove around with the gun in the car. Contrary to Taylor's claims, the prosecutor properly defined possession according to the jury instruction and fully explained the difference between actual and constructive possession.

¶ 43    Next, Taylor claims error where the State told the jury that it was "almost duty-bound under the law to disregard" Taylor's testimony. Taylor contends the jury must only disregard evidence the court struck or refused to admit. In our view, it was not improper for the prosecutor to comment on Taylor's credibility and his view that the evidence overwhelmingly supported a guilty verdict. We find the prosecutor did not misstate the law.

¶ 44    We next look at whether the State's comments, that if there had not been a car chase, the shotgun would have gone home with Taylor or stayed in his car, were improper. Taylor argues the comments were not based on any evidence and were in contradiction to Woods's claimed ownership of the gun. We consider the comments were based on the evidence. According to Woods's testimony, he planned to hide the gun in the alley and retrieve it later. Because that plan failed, the logical inference was that Woods would return to Taylor's residence with the gun still in the vehicle. Similarly, the prosecutor's comment that Taylor had some role in providing the gun to Woods before Woods confronted Turngren was a reasonable inference based on the evidence. According to Turngren, after he took her cell phone, Woods walked to the car and returned quickly

17

with the gun. By Taylor's own account, he was sitting in the car and would have at least seen Woods grab the gun. Moreover, based on Turngren's recollection of the time sequence, Taylor could have assisting Woods in retrieving the gun.

¶ 45     Taylor contends the State misstated the facts. The prosecutor told the jury that Woods never explained how the gun got into the car. Taylor says that Woods did explain, testifying that he placed the gun in the car earlier in the day when Taylor had loaned the car to him. The prosecutor actually said that Woods never rationally explained how the gun ended up in the car. Woods's explanation consisted of vague references to collecting his gun from one location and moving it to hide elsewhere, which he claimed he was doing in the alley. The prosecutor also said Woods did not explain why they were in the alley but mentioned giving the gun to someone else. Taylor says Woods testified his brother lived nearby and he wanted to stash the gun because he was going to his brother's house that evening. Woods also told Taylor that he needed to stop in the alley to use the outdoor facilities. The State's comments were directed at the witness's credibility and were not misstatements of the facts.

¶ 46     Taylor also complains the prosecutor misstated the evidence in arguing that Richard and Janice said they saw the man walking in the alley did not have a gun while Woods said they saw him with the gun. Both Richard and Janice explained they noticed the man in the alley and were apparently alert to his presence. They each testified regarding the gun he used when he robbed them in the garage. Even if the witnesses did not expressly state the man walking in the alley was not carrying a gun, a reasonable inference from the facts would be that they would have testified he had a gun if they saw him with one. It is further reasonable to infer that had they noticed a gun, they would have kept driving or immediately closed the garage door after entering the garage.

18

¶ 47    The State commented that Taylor and Woods bragged and laughed in the car after the robbery. The prosecutor also said, "What are they doing? I don't know. *** Maybe they're—they're bragging. Maybe they're laughing. Who knows?" The prosecutor threw out as examples that Taylor and Woods were laughing or bragging but expressly stated he did not know what they were doing. Similarly, the State also said that Taylor testified there were 16 guns pointed at him after the car crash and that was why he ran. Taylor says his testimony was actually that one officer was "drawing his weapon." The prosecutor exaggerated Taylor's statements to the police during his videotaped interview that there were "all these guns." He did so in discussing Taylor's credibility as he testified at trial that he only saw one gun. The comments were not improper. See *People v. Roe*, 228 Ill. App. 3d 628, 638 (1992) (prosecutors afforded wide latitude in closing argument and hyperbole based on the evidence not improper).

¶ 48    Next, Taylor argues the prosecutor improperly appealed to the jurors' emotions, shifted the burden of proof and failed to accord him the presumption of innocence. Taylor says the State improperly focused on his character in calling him an animal on the prowl, leaving a seven-month-old with breathing problems in the back seat of the car, in stating he was looking for prey and fled after the target was found, and in suggesting Taylor did not care about his stepson by stating, "[w]hat kind of person would not say get this gun out of my car. My little kid's in the back" and that Taylor risked the child's life to commit the crime. Taylor was charged with child endangerment and the State's comments were directed to Taylor's actions regarding his stepson, who he allowed to share a back seat with a gun and left dangling in the car seat after he crashed. The comments were not inappropriate or directed at the jury's emotions but were based on the evidence.

19

¶ 49    The prosecutor challenged Woods's testimony that Taylor was unaware the crimes were being committed, Taylor's denials of the events and his invitation for the jury to compare the evidence from the State and its witnesses to determine who to believe. According to Taylor, the comments instructed that the jury could decide guilt based on who was more credible, which improperly shifted the burden of proof. The State may comment on the credibility of witnesses and the comments here did not impermissibly shift the burden of proof. See *People v. Phillips*, 127 Ill. 2d 499, 527 (1989) ("Not every prosecutorial statement questioning relevance or credibility rises to an impermissible shifting of the burden."). He also claims the State improperly shifted the burden of proof when it commented that the only cash found was in Taylor's pocket, suggesting Taylor had to establish money was also found on Woods or in the car. The evidence established that nine $1 bills were found on Taylor and no other money was found on Woods or in the car. Richard Simms testified that he had between $5 and $10 in $1 bills stolen from him. That the facts present Taylor in a negative light does not make comments about the facts improper. We conclude the State's comments did not shift the burden of proof but merely restated the evidence. Finally, Taylor attacks the prosecutor's statements that the case was solved due to good police work resulting in the arrest of the guilty parties, arguing it denied him the presumption of innocence by implying his guilt was established when he was arrested. Arrest does not equate to guilt and the jury was tasked with determining guilt, not the police or the prosecutor, as it was instructed. See *People v. Attaway*, 41 Ill. App. 3d 837, 850 (1976) (arrest cannot be considered evidence of guilt).

¶ 50    The State did not misstate the facts or the law, appeal to the jury's emotions, shift the burden of proof and ignore the presumption of innocence. There was no error, much less plain or obvious error. Thus, plain error review is not appropriate and we find the issue of prosecutorial

20

misconduct is forfeited. See *People v. Petty*, 2017 IL App (1st) 150641, ¶ 45 (counsel is not ineffective when he or she does not make meritless objections).

¶ 51       Taylor further submits that if plain error review fails him, trial counsel was ineffective for failing to preserve the errors. As discussed above, there were no errors and counsel cannot be ineffective for failing to object. Even if there were errors, Taylor cannot show that they prejudiced him such that the result of the trial would have been different. The jury was instructed by the court that closing arguments did not constitute evidence and the prosecutor told the jury that if he inadvertently misstated anything, it was not in an attempt to deceive them. Taylor cannot use a claim of ineffective assistance of counsel to obtain review of this issue and we reject his attempt to do so.

¶ 52       The third issue for our review is whether trial counsel was ineffective during other portions of the trial. Taylor argues his trial counsel provided ineffective assistance when he failed to request that the interrogation video be redacted, to amend the jury instructions to exclude specifics regarding his prior felony and to object when the trial court *sua sponte* changed the accountability instruction.

¶ 53       To establish ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶ 54       First, Taylor submits his attorney performed deficiently when he failed to redact the video of Taylor's interrogation, which Taylor says contained numerous irrelevant and inflammatory comments and included details about his involvement in a prior armed robbery.

21

¶ 55 The statements made by police officers during an interview with a defendant are admissible when needed to show how the statement affected the defendant or to explain the defendant's response. *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35. To be admissible, an officer's statements must also be relevant and the probative value of the statements must outweigh their prejudicial effect. *Id.* As with any witness, the officer's opinion may not be admitted if it is not concerned with statements of facts of which the officer has personal knowledge. *People v. Sprinkle*, 74 Ill. App. 3d 456, 464 (1979). However, police officer statements about the ultimate question of fact, such as the defendant's guilt, threaten to prejudice the defendant because police officers are considered authority figures. *People v. Munoz*, 398 Ill. App. 3d 455, 488-89 (2010).

¶ 56 The comments asserted by the officers during the interrogation regarding their opinion that Taylor was guilty and about another unconnected robbery earlier the same day were not inadmissible and counsel's failure to seek redaction of them was not deficient performance. The video showed the interrogating officers questioning Taylor about his prior arrest for armed robbery. The comments were made in response to Taylor asking, "what did I rob?" The statements did not require redaction. Taylor further complains the comments were improper other-crimes evidence. However, the copy of his prior conviction for armed robbery was entered into evidence. Moreover, Taylor himself testified regarding his prior convictions, including that he was on parole for armed robbery when the instant offenses were committed. The jury did not learn any information prejudicial to Taylor that it had not already known. Redaction was not necessary and counsel was not ineffective for failing to request it.

¶ 57 Next, Taylor challenges counsel's failure to redact the officers' statements where they opined that Taylor was guilty. He points to a number of statements by the officers he argues were improper. When he denied robbing anyone, the officers said that he did rob people that day and

22

that he was lying. They questioned him regarding his role under an accountability theory, explaining to him that his actions amounted to participation in the crimes. These statements were intended to encourage Taylor to admit to the crimes and were directed at Taylor's credibility. They were not offered to provide an opinion regarding Taylor's guilt. As such, the statements were not improper and defense counsel was not ineffective for failing to challenge them.

¶ 58        Taylor further argues that his trial attorney should have proposed alternative language for the pattern jury instructions regarding his prior felony conviction. The State offered instructions which specified that Taylor had previously been convicted of armed robbery. He complains counsel should have presented instructions replacing "armed robbery" with "felony" because of the prejudice attached to commission of the same crime.

¶ 59        Illinois Pattern Jury Instructions, Criminal, No. 3.13X (approved Oct. 17, 2014) provides that a prior conviction is generally only considered as to a defendant's credibility. Because the State in the instant case was required to prove defendant was convicted of a prior felony to sustain the weapons charge, the jury could properly consider the prior conviction for the specific offense only to decide if the State met its burden as to that offense. To prove Taylor guilty beyond a reasonable doubt of unlawful possession of a weapon by a felon, the State had to establish that he had previously been convicted of a felony. Illinois Pattern Jury Instruction, Criminal, No. 18.08 (4th ed. 2000). There is no requirement that the specific felony not be mentioned; rather, the court must weigh its probative value against its prejudice. See *People v. Davis*, 405 Ill. App. 3d 585, 594 (2010). Evidence of Taylor's conviction was necessary for the State to prove its case regarding the possession of a weapon by a felon charge. The probative value of the conviction outweighed the prejudice, if any, to Taylor. Because Taylor testified to his prior conviction for armed robbery,

he was not prejudiced by counsel's failure to challenge the instruction. We find defense counsel was not ineffective for failing to challenge the State's tendered jury instruction.

¶ 60      Lastly, Taylor challenges his attorney's failure to object to the trial court's change to the accountability instruction. After reviewing the instruction, the trial court removed the committee notes included by the State. According to Taylor, because his intent was a critical issue in the case, the language from committee notes should have been included and his attorney should have objected to its removal.

¶ 61      The language at issue in the committee notes stated: "intent to promote or facilitate" may be shown by evidence of shared criminal intent or common criminal design. IPI Criminal No. 5.03). The accountability instruction provided the jury stated that a person is legally responsible when "with the intent to promote or facilitate" the commission of an offense, he "knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person." IPI Criminal No. 5.03. Taylor was not entitled to use of the committee note language and counsel may have had a strategy for not objecting to its removal. *People v. Edwards*, 343 Ill. App. 3d 1168, 1176 (2003) (committee notes are not the law; trial court should deviate from suggested instructions only when necessary due to unusual facts or new law). Taylor does not explain how removal of the language prejudiced him, particularly in light of the State's theory at trial that Taylor and Woods engaged in shared criminal intent or common criminal design. The trial court did not err when it removed the committee note language and its removal did not cause any prejudice to Taylor. We find defense counsel was not ineffective for failing to object to the State's instruction.

¶ 62                              CONCLUSION

¶ 63      For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

¶ 64        Affirmed

¶ 65        JUSTICE McDADE, dissenting:

¶ 66        I respectfully disagree with the majority's decision to affirm the circuit court's judgment. For the following reasons, I would hold that the circuit court erred when it denied Taylor's motion for a directed finding on the armed robbery and unlawful possession of a weapon by a felon charges. Further, although it would not be necessary to reach the issue, I also believe that Taylor was entitled to a new trial based on prosecutorial misconduct that occurred during closing argument.

¶ 67        Regarding his motion for a directed finding on the armed robbery charge, Taylor contends that the State failed to prove beyond a reasonable doubt that he intentionally aided Woods either before or during the robberies.

¶ 68        Section 115-4(k) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4(k) (West 2016)) provides:

> "When, at the close of the State's evidence or at the close of all of the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant." *Id.*

When a defendant moves for a directed finding, he or she admits the truth of the facts presented by the State, but asserts that as a matter of law, the evidence is insufficient to support a guilty verdict or finding. *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003). "In considering the denial of such a motion, we review the evidence presented by the State, in a light most favorable to the State, to determine whether a reasonable mind could fairly conclude defendant was guilty beyond

25

a reasonable doubt." *People v. Tabb*, 374 Ill. App. 3d 680, 691 (2007). This court reviews the denial of a motion for a directed finding *de novo*. *Id.*

¶ 69 In relevant part, section 5-2(c) of the Criminal Code of 2012 (720 ILCS 5/5-2(c) (West 2016)) provides that an individual is legally accountable for the actions of another when:

"[E]ither before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." *Id.*

"Mere presence of a defendant at the scene of a crime does not render one accountable for the offense." *Taylor*, 164 Ill. 2d at 140. Additionally, presence at the scene coupled with knowledge that a crime is being committed, without more, does not establish that one is accountable for another's conduct. *Id.* Nevertheless, proof of the common design or agreement can be inferred from the circumstances surrounding the action or actions. *Id.* at 141. Active participation or words of agreement are not necessary to find accountability. *Id.* at 140-41. Factors to be considered in accountability scenarios include: "[p]roof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the

crime, and that he failed to report the crime[.]" *Id.* at 141. An additional factor that can be considered is whether the defendant fled the scene. *Id.*

¶ 70    Viewing the evidence in the light most favorable to the State, I believe that the evidence was insufficient to allow a reasonable mind to fairly conclude that Taylor was guilty beyond a reasonable doubt of armed robbery under an accountability theory. Of critical importance here is that the State did not present evidence to support many of the inferences it sought from the evidence. The State presented no evidence to show that Taylor actually knew that Woods intended to rob anyone prior to the actual robberies or that he contributed in any way to a plan to commit any crimes. While Taylor drove the vehicle to the alley where the robberies took place, there was no evidence to indicate that his doing so was anything more than him driving to a location at Woods' request. It also seems highly unlikely that a person setting out to commit armed robbery would take an infant along. Further, even if it were reasonable to infer that Taylor heard Woods' interaction with Turngren and therefore knew that Woods was committing a crime, there was no evidence to indicate that he contributed in any way to the planning or commission of that crime. His mere presence at the scene, without more, was insufficient to establish accountability.

¶ 71    Regarding the shotgun, Woods testified that he placed it in the vehicle during the morning of June 2, 2015, when he borrowed the vehicle from Taylor. The State presented no evidence to contradict this testimony or to support an inference that Taylor knew that it was in the vehicle prior to Woods' return to the vehicle after committing the robberies. In this regard, even though the evidence showed that the shotgun was long, it is noteworthy that the State did not present any evidence related to its size, either independently or relative to the size, shape, or condition of the interior of the vehicle, especially the floor of the back seat. There are no facts from which one could reasonably conclude that the shotgun could not have been concealed from sight in the rear

27

of the vehicle. In fact, a photograph of the back seat of the vehicle, which was taken after the crash, showed the two front seats reclined over the top of the floor of the back seat, indicating that a shotgun placed there could have been invisible to the driver. Clearly, Taylor knew about the shotgun when Woods later got into the front passenger seat carrying it, but that fact by itself is not proof of a shared criminal intent or common design.

¶ 72    While it is true that Taylor was found with one $10 bill, one $5 bill, and nine $1 bills, the State did not present any forensic evidence to show that any of this money had ever been in Simms' possession or was in fact robbery proceeds. Taylor testified that he had cash remaining after using some to purchase food, gas, and cigarettes. Simms was unsure of the amount of money he had. It is no less reasonable for Taylor to lack knowledge of the exact amount of money he had in his pocket than it was for Simms to lack such specific knowledge. Absent such specific evidence, and with a clear showing that it was Woods, not Taylor, who actually robbed Simms, the State has failed to show it was Simms' money in Taylor's possession.

¶ 73    I acknowledge that it appeared to be a particularly egregious act for Taylor to flee the scene of the accident when his son was in dire straits in a car seat inside the vehicle. However, there was no evidence that he was aware of the seriousness of the child's situation and it is undisputed that he had just committed several traffic violations, including driving without a license, and he certainly knew by then that Woods had been up to no good. Moreover, the presence of the child in the car would be strong additional evidence that Taylor was not involved in the planning and execution of this criminal activity. Not only was there a potential to endanger the child, the child's very presence increased the risk of something going wrong with the potential robberies. I would also note that his presence could have been leverage to undermine Taylor's ability or desire to resist Woods' actions once he became aware of the criminal nature of those actions. Coupling this

evidence and inference with the aforementioned lack of factual evidence linking Taylor to the robberies, Taylor's flight from the accident scene cannot fairly be construed as proof beyond a reasonable doubt that he was accountable for Woods' actions.

¶ 74		Under these circumstances, I would hold that the actual evidence indicated at best that Taylor was present at the scene of the robberies, possibly, maybe even probably, knew that Woods committed the robbery of Turngren, drove Woods away from the scene of the robberies, and fled the scene of an accident. Without more, I would hold that a reasonable mind could not fairly conclude beyond a reasonable doubt that Taylor was accountable for the armed robberies. Thus, I would hold that the circuit court erred when it denied Taylor's motion for a directed finding on the armed robbery charges.

¶ 75		Regarding his motion for a directed finding on the unlawful possession of a weapon by a felon charge, Taylor contends that the evidence was insufficient to show that he possessed the shotgun.

¶ 76		It is undisputed that Taylor was not found in actual possession of the shotgun. Thus, to establish that Taylor possessed the shotgun in this case, the State was required to prove constructive possession. *McCarter*, 339 Ill. App. 3d at 879. Proof of constructive possession requires "that defendant had knowledge of the presence of the weapon and exercised immediate and exclusive control over the area where the weapon was found." *Id.* "Evidence establishing constructive possession is often entirely circumstantial." *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002). Constructive possession exists when an individual has "an intent and capability to maintain control and dominion" over the contraband. *People v. Freiberg*, 147 Ill. 2d 326, 361 (1992).

29

¶ 77    Mere presence in a vehicle in which a weapon is found, without more, is insufficient to establish constructive possession. *Bailey*, 333 Ill. App. 3d at 891. "Factors from which knowledge could be inferred include: (1) the visibility of the weapon from defendant's position in the car, (2) the period of time in which the defendant had an opportunity to observe the weapon, (3) any gestures by the defendant indicating an effort to retrieve or hide the weapon, and (4) the size of the weapon." *Id.* at 891-92.

¶ 78    My review of the evidence presented in this case reveals reasonable doubt as to whether Taylor constructively possessed the shotgun. As previously mentioned, Woods testified that he placed the shotgun in the vehicle during the morning of June 2, 2015, when Taylor let him borrow the vehicle, and the State presented no evidence to contradict this testimony. It is true that the shotgun was long, but, as noted above, there was no evidence that it could not have been placed in the vehicle in such a manner that Taylor would not have noticed it. Again, there is a photo in the record that suggests that it could have been concealed from Taylor's view given how far back the front seats were set. The evidence further suggested that Taylor was aware of the shotgun once Woods got back into the front passenger seat after committing the robberies, but there was no evidence to suggest that Taylor intended or attempted to exert control over the weapon from that point on. Under these circumstances, I would hold that a reasonable mind could not fairly conclude that Taylor constructively possessed the shotgun beyond a reasonable doubt. Thus, I would hold that the circuit court erred when it denied Taylor's motion for a directed finding on the unlawful possession of a weapon by a felon charge.

¶ 79       While the aforementioned analysis would be sufficient to reverse the circuit court's judgment, I would also find reversible error in his prosecutorial misconduct argument.[1]

¶ 80       It is undisputed that Taylor failed to preserve this issue for review. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (holding that preservation of an issue for appeal requires both an objection at trial and raising the issue in a posttrial motion). However, Taylor requests this court to review the issue under the plain-error doctrine.

¶ 81       The plain-error doctrine allows a reviewing court to address the merits of a forfeited claim if clear or obvious error occurred and either (1) the evidence was closely balanced, or (2) the error was so serious that it impacted the fairness of the trial and threatened the integrity of the judicial process. *Id.* ¶ 48. Thus, it is necessary to determine first whether clear or obvious error occurred. *Id.* ¶ 49.

¶ 82       A prosecutor has a duty to ensure that a defendant receives a fair trial. *People v. Sales*, 151 Ill. App. 3d 226, 233 (1986); see also *People v. Oden*, 20 Ill. 2d 470, 483 (1960) (stating that "it is the rule that the State's attorney in his official capacity is the representative of all the people, including the defendant, and it is as much his duty to safeguard the constitutional rights of the defendants as those of any other citizen"). It is well settled that:

> "[p]rosecutors are afforded wide latitude in closing argument. [Citation.] In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. [Citation.] Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper

---

[1]An instructive commentary on the pervasiveness of prosecutorial misconduct in closing argument can be found in *Combating Prosecutorial Misconduct in Closing Arguments*, 70 Okla. L. Rev. 887 (2018).

remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 83        Taylor challenges as false, speculative, and prejudicial the following multitude of statements made by the prosecutors during both their initial closing argument and their rebuttal argument: (1) that Woods had nothing to lose by testifying that Taylor was not involved in the robberies;[2] (2) about accountability and the example of a getaway driver in a bank robbery; (3) about the law of possession; (4) about the jury being "almost duty-bound" to disregard Taylor's testimony; (5) that Woods did not testify as to how the shotgun got into the vehicle; (6) that Woods did not explain why they were in the alley; (7) that Taylor testified there were 16 police officers pointing their guns at him; (8) that the Simmses testified that Woods did not have a gun when they saw him walking in the alley; (9) about what Taylor and Woods were doing in the vehicle after the robberies; (10) that without the car chase, the shotgun would have either remained in Taylor's car or gone to Taylor's house; (11) that Taylor had "a little more than something to do with" Woods retrieving the shotgun during his encounter with Turngren; (12) that likened Taylor to an animal because he was "on the prowl" and "looking for prey"; (13) that Taylor did not care about his son; (14) about Taylor's testimony that he did not know what was going on during the robberies; (15) about the money found in Taylor's pocket when he was arrested; and (16) that this case was solved due to good police work resulting in the arrest of two guilty people.

---

[2]The circuit court, however, *cautioned* Woods that he was giving up his right to claim fifth amendment protection because 30 days had not elapsed from his own conviction.

¶ 84     My review of the challenged statements reveals numbers 4 to 11, 15, and 16 to be examples, to varying degrees, of prosecutorial misconduct. Some of these comments show that the prosecutors misstated facts and evidence, which was unquestionably improper. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47 (holding that "[i]t is *** improper for a prosecutor to misstate the evidence or argue facts not in evidence"). Further, the wholly speculative comment that Taylor and Woods may have been laughing in the car after the robberies appeared to be aimed solely at inflaming the passions of the jury, which is also improper. *People v. Redmond*, 2018 IL App (1st) 151188, ¶ 30 (holding that "comments intending only to arouse the prejudice and passion of the jury are improper"). I would also find improper the comments made about the money found in Taylor's pocket and about the case being solved due to good police work that resulted in the arrest of two guilty individuals. Both comments operated to shift the burden of proof away from the State and to intrude upon the presumption of innocence afforded an accused. In addition, I would find improper the comment made during a discussion of alleged inconsistencies in Taylor's testimony—*i.e.*, when the prosecutor told the jury that "as finders of fact you are absolutely entitled and almost duty-bound under the law to disregard what [Taylor] says." On the contrary, jurors are duty bound to consider all of the evidence and certainly should not disregard the testimony of the defendant who takes the stand, takes the oath to tell the truth, and testifies in his own defense. While a prosecutor may comment on witness credibility during closing argument (*People v. Richardson*, 123 Ill. 2d 322, 356 (1988)), it is important to note that it is the responsibility of the trier of fact to assess witness credibility (*People v. Valko*, 201 Ill. App. 3d 462, 471 (1990)) and that the prosecutor "may not invade the province of the jury or act as a 'thirteenth juror' " (*People v. Enoch*, 189 Ill. App. 3d 535, 552 (1989)). I believe that telling the jury it is "almost duty-bound" to *disregard* testimony goes beyond the permissible bounds of reflecting upon witness credibility.

33

Even if no single comment was sufficient to constitute a material factor in Taylor's convictions, the cumulative impact of these comments leaves me with the compelling impression that the jury was prejudiced and that the comments constituted a material factor in Taylor's convictions. See *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982).

¶ 85 Having determined that error occurred, the next task is to determine whether that error was reversible under one of the two prongs of the plain-error doctrine. Taylor asserts that first-prong plain-error applies—*i.e.*, that the evidence was closely balanced such that "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119945, ¶ 51. I agree with Taylor that the evidence in this case was closely balanced. As I discussed earlier, the State's evidence was sorely lacking on the armed robbery and unlawful possession of a weapon by a felon charges. After "evaluat[ing] the totality of the evidence and conduct[ing] a qualitative, commonsense assessment of it within the context of the case" (*id.* ¶ 53), I would conclude that the prosecutors' comments substantially and materially violated Taylor's rights such that, if I were not persuaded to decide the first issue in his favor, I would have held that he would be entitled to a new trial based on prosecutorial misconduct.

¶ 86 Lastly, based on my analysis of his first two arguments, I would not reach the merits of his argument based on ineffective assistance of counsel.

¶ 87 For the foregoing reasons, I respectfully dissent.